# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 24

----------------------------------------------------------------X

ERICA F. GOTTLIEB,

                    Plaintiff,

    -against-

IAN S. GOTTLIEB,

                    Defendant.

----------------------------------------------------------------X

Index No. 312670/11

FINAL ORDER OF CUSTODY
AFTER TRIAL

Hon. Ellen Gesmer, JSC

Plaintiff Erica Gottlieb (Mother) commenced this action for divorce and ancillary relief on September 26, 2011. The defendant Ian S. Gottlieb (Father) commenced a separate divorce action in North Carolina, and obtained a judgment of divorce from the North Carolina General Court of Justice District Court Division on February 8, 2013. After litigation in North Carolina and New York regarding custody jurisdiction, both jurisdictions determined that New York is the Children's home state, and has custody jurisdiction (*Gottlieb v Gottlieb*, 103 AD3d 593 [1st Dept 2013]). This court held a custody trial on February 25 and 26, March 24 and 31, May 12, 19 and 20, July 16 and 30, September 2, 3, 8, 9, 10, 15, 29 and 30, October 1 and 6, November 3, 2014 and February 18, 2015, and issued a Decision After Trial dated June 16, 2015. In accordance with the Decision After Trial, it is

ORDERED that the Mother shall have sole legal and physical custody of the parties' children, Gabrielle Gottlieb (DOB: 11-3-05) and Jacob Gottlieb (DOB: 12-27-07) (collectively, the Children); and it is further

ORDERED that the Father may have up to one supervised visit at a supervised visitation facility in New York consistent with this Order, for up to four hours, with the Children each week, or on Saturday and the following Sunday of every other weekend, for up to four hours each day, provided he confirms, in writing (email shall suffice), the dates, times and locations of such visits with the Mother at least 14 days in advance, and provided that he makes the arrangements for supervision of his visitation; and it is further

ORDERED that the Father's in-person visits shall take place only on the premises of the supervised visitation facility, and the Father shall not be permitted to leave the facility with the Children; and it is further

ORDERED that, in addition to the supervised in-person visits above, provided that the Father has arranged for a supervisor in accordance with this Order, he may have supervised telephone contact with the Children up to four days each week at reasonable times and for reasonable periods of time that do not interfere with the Children's school, scheduled activities, dinner or bed times, as agreed between the parties in writing (email shall suffice), or, if the parties are unable to agree, then every Tuesday, Thursday, Friday and Saturday between the hours of 6:00 p.m. and 7:00 p.m. for up to 15 minutes with each child; and it is further

ORDERED that all of the Father's in-person visitation and telephone access supervision shall be conducted by Comprehensive Family Services (CFS), unless the parties agree in writing (email shall suffice) to another visitation supervisor; and it is further

ORDERED that the Father may seek to modify his access with the Children upon a showing that he has attended psychotherapy with a licensed therapist at least once each week for six months, and after he has had at least 12 in-person visits with the Children in a 12 month period; and it is further

ORDERED that the Father shall be permitted to obtain copies of the Children's school, medical and dental records not otherwise privileged by law; and it is further

ORDERED that the Mother shall advise the Father within five days of any changes in the Children's residence address, telephone number(s) at which the Children may be reached, schools, and medical, dental and mental health care providers; and it is further

ORDERED that the Mother shall be entitled to take up to two weeks of vacation time with the Children during their summer school break each year, which shall supersede the Father's right to supervised visitation and telephone access above, provided that the Mother shall notify the Father of the dates of such summer vacation at least four weeks in advance.

Dated: June 16, 2015

ENTER:

_____
Hon. Ellen Gesmer, JSC

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 24
-------------------------------------------------------------------X

ERICA F. GOTTLIEB,

                Plaintiff,                      Index No. 312670/11

    -against-                             CUSTODY DECISION AFTER
                                        TRIAL
IAN S. GOTTLIEB,                          Hon. Ellen Gesmer, JSC

                Defendant.
-------------------------------------------------------------------X

       Plaintiff Erica Gottlieb (Mother) commenced this action for divorce and ancillary relief on September 26, 2011. The defendant Ian S. Gottlieb (Father) commenced a separate divorce action in North Carolina, and obtained a judgment of divorce from the North Carolina General Court of Justice District Court Division on February 8, 2013. Each party seeks sole legal and physical custody of their children, Gabrielle Gottlieb (DOB: 11-3-05) and Jacob Gottlieb (DOB: 12-27-07) (collectively, the Children). After litigation in North Carolina and New York regarding custody jurisdiction, both jurisdictions determined that New York is the Children's home state, and has custody jurisdiction (*Gottlieb v Gottlieb*, 103 AD3d 593 [1st Dept 2013]).

       The court heard testimony on February 25 and 26, March 24 and 31, May 12, 19 and 20, July 16 and 30, September 2, 3, 8, 9, 10, 15, 29 and 30, October 1 and 6, and November 3, 2014, and February 18, 2015.

       At the commencement of the trial, each party was represented by counsel. The court scheduled trial dates on October 14 and 15, 2014, but the Father said that he was unavailable, allegedly because of a cat bite on October 11, 2014 that he claimed prevented him from appearing for trial. The trial was also scheduled to go forward on December 2, 2014, but it did not because the Father's counsel made an oral application to be relieved. As this court has done in the past, I offered to appoint counsel for the Father if he submitted a Net Worth Statement to me which showed that he was indigent. I granted his counsel's motion to be relieved on January 21, 2015, and adjourned the trial from February 3 and 4, 2015 to February 17, 18, 24 and 25, 2015, to give the Father time to obtain counsel if he chose to do so.[1] After various conference calls, the February 17 trial date was cancelled at the Father's request. On February 17, 2015, on a conference call, the Father requested an adjournment of the February 18 trial date, which the court denied (*Ma v Washington*, 127 AD3d 982 [2nd Dept 2015][Not abuse of discretion to deny adjournment in view of father's history of missing court dates because of unsubstantiated claim of impoverishment, and the length of pendency of the proceeding]). On February 18, the Father did not appear, and I continued with testimony and completed the trial.

       At the trial, each party testified. In addition, the Mother presented the testimony of Mr. Stockner, a child protective services supervisor at the New York City Administration for Children's Services (ACS); and the Mother's father, Armand Elster. The Father presented the testimony of Matthew Davis, a child protective specialist employed by ACS; Katie Gallagher, the Father's girlfriend; and Danielle Horne, the director of Gateway Academy Child Development Center (Gateway) in Wilmington, NC. The court

---

[1] I also again offered to provide counsel to the Father if he would execute a Net Worth Statement which showed that he was eligible. He rejected the court's offer.

accepted into evidence on consent the forensic report dated October 1, 2013 of the court-appointed forensic psychologist, Dr. Larry Cohen, who was cross-examined by counsel for each party. The parties also agreed to incorporate by reference the testimony of Mr. Davis from May 30, 2012, and the testimony taken at the hearing on the Order of Protection on July 17 and 18, 2013.

## FACTS

Based on the testimony and evidence at trial, the court makes the following findings.

### Credibility

The Father was not credible. In answering questions, he was evasive and argumentative. Many parts of his testimony were plainly incredible. He acknowledged during his testimony that there are false statements in his own sworn affidavits submitted to this court, such as a statement in his October 17, 2011 affidavit that he had met with the Mother on July 6, 2011 in New York, even though he was in North Carolina that day. His testimony that he first knew at the end of August 2011 that the Mother objected to his having taken the Children to North Carolina in July 2011 was also incredible. Also incredible was his testimony that he believed that the Mother was drug dependent, used heroin, and was unable to care for the Children in fall 2010, given that he nonetheless left the Children with her for a period of ten months starting in fall 2010. He often made inconsistent statements. For example, in his direct testimony, he stated that he and the Children moved into a trailer in July and moved into Ms. Gallagher's home in August 2011, but on cross-examination, he said that they moved into Ms. Gallagher's home on or about July 6, 2011.

Ms. Gallagher was not credible. She uncritically believed everything that the Father told her, and exercised no independent judgment as to anything he said. She submitted sworn affidavits to this court in which she made statements which she represented to be based on her own knowledge, although they were based solely on statements made to her by the Father.

Ms. Horne was not credible, as she was clearly allied with the Father and tailored her testimony to his interests. Mr. Elster was very credible. Mr. Stockner was credible when he was asked about matters within his personal knowledge. Mr. Davis was credible.

### The Father's Background

Mr. Gottlieb is in the liquidation business. For a period of time, he also ran a secondhand store on Rockaway Avenue in Canarsie, Brooklyn. There was also an online component of the store through EBay.

### The Mother's Background

The Mother attended South Shore High School, and then Kingsborough Community College for one year, where she studied business management.

The Mother had one son, Scott Elster, prior to meeting Mr. Gottlieb. Scott is now 17 years old and currently resides with his Mother and half-siblings in Long Island. At the time of trial, he was in his senior year at Newfield High School.

In 2001, the Mother graduated from a trade school with a degree in cosmetology. From 2001 to 2005, she was employed at various jobs, including at a supermarket, a salon, and a pharmacy.

As discussed further below, the parties were married on July 17, 2005. In 2005, the Father asked the Mother to help out with his business. She then left her employment at the pharmacy, and worked with the Father doing customer service at his store from 2005 to 2011.

From 2011 to 2012, the Mother was unemployed. From 2012 to 2013, she was employed as a live-in caretaker for an elderly woman with cancer who lived in Long Island. The Mother has also worked as a telemarketer, first at All Island, and then at All Star, where she was still employed at the time of trial. At various times, she worked on the night shift from home from 5:00 p.m. to 9:00 p.m. At the time of trial, she worked from 10:00 a.m. to 2:00 p.m., five days per week.

The Mother has suffered from Type 1 diabetes since she was a young girl. She generally manages it well.

Prior to moving to her current residence on November 29, 2013, the Mother lived at her parents' home on 2058 East 57th Street in Brooklyn, a two family house. She currently resides at 498 Hawkin Road in Selden, New York, with her 77 year old father, Armand Elster, her son Scott, and the parties' Children, Gabrielle and Jacob. It is a five bedroom house.

Mr. Elster is now a retired widower. His last employment was as a physical therapy technician at Beth Israel Hospital. Before that, he was employed at Kingsborough Jewish Medical Center, and before that, he was a paramedic in the U.S. Army.

### The Mother and Father's Relationship Prior to the Birth of their Children

The parties met in 2004, when the Mother was living in Brooklyn with her parents and her son Scott at 2058 57th St, Brooklyn, New York. They married on July 17, 2005 in Rockland County. After the wedding, the Mother and Scott moved into the Father's home on 2074 Gerritsen Avenue, Brooklyn, a ten minute drive from the Mother's parents' home.

At the beginning, the parties enjoyed being together and did not fight. They worked well together in the Father's business.

### The Mother and Father's Relationship After the Birth of Gabrielle

Gabrielle was born on November 3, 2005. After Gabrielle's birth, the Mother mostly stopped working, at the Father's request. On occasion, she would work one day per week; on those occasions, her mother would babysit. The Mother was the primary caretaker of Gabrielle. She prepared breakfast, lunch and dinner for her. She played with her and bathed her. She also cooked, cleaned, did laundry, and cared for the family's dog.

When Gabrielle was born, the Father worked six days a week, leaving the house around 8:00 a.m. and returning home between 6:00 and 7:30 p.m. After work, the Father played with Gabrielle. He also helped with the cooking, laundry and household cleaning.

The Mother and Father's relationship did not change after the birth of Gabrielle. They did not argue, and had no disagreements regarding Gabrielle's care.

### The Mother and Father's Relationship After the Birth of Jacob

Jacob was born on December 27, 2007. After Jacob was born, the Mother stayed home alone with both of the Children while the Father was at work. The parties' responsibilities and duties for the Children and the household did not change. The Mother worked about one day per month at the Father's store in the winter, and about four days per month in the summer. When she worked, her mother or her friend Janie Bove would babysit the Children.

When Mr. Gottlieb returned from work, the family would spend time together, sometimes going to the park. On weekends, they took family outings to Sesame Street Live and the circus. Mr. Gottlieb never cared for the Children alone. The parties had no major disagreements about Jacob's care. However, the Mother felt that the Father yelled at Jacob excessively and made derogatory comments to him.

Mr. Elster had a close and appropriate relationship with both of the Children, and saw them at least three or four days per week. No one disagreed with his testimony that he "spoiled them rotten." On occasion, he and his wife (who died in 2013) cared for the Children. From time to time, the Children stayed at their maternal grandparents' home so that the Father and Mother could have some time alone. Mr. Elster never took care of the Children alone or changed or bathed them. From 2005 to 2011, the Children saw their maternal grandparents about four times per week. The Father had a good relationship with the Elsters, and said nothing negative about either of them prior to July 2011.

The Children have never had a relationship with the Father's father. The Father was estranged from his Mother, Helene Gottlieb, from about 2005 to 2010, and she did not see the Children during that time. In or about 2010, then four year old Gabrielle expressed an interest in getting to know her paternal grandmother, and that led to a meeting in September 2010. After that and until June 2011, the Children visited her about one weekend per month at her home at 23 South Park Drive, Haverstraw, New York. Starting in about April 2011, Gabrielle began complaining about having to visit her paternal grandmother, claiming that she was denigrating Gabrielle, Jacob, Scott and her parents. The Mother told Gabrielle that she had to visit her grandmother.

Scott, Gabrielle and Jacob had, and still have, a very close relationship.

From the time of the parties' marriage until fall 2010, the Mother observed the Father taking heroin and other illegal drugs daily. The Mother tried heroin in or about December 2006 and stopped in or about February 2007; she tried it again in or about 2008 and stopped soon after.

The Mother generally controls her diabetes with medication, but she was hospitalized twice. In May 2008, she was home with Scott and the Children, and Gabrielle called Mr. Elster, who came

immediately and took the Mother to the hospital. She was hospitalized on one other occasion in or about 2009.

**The Move to North Carolina**

In or about 2008, the parties started talking about moving out of Brooklyn, to California or North Carolina. In 2009, they began to make a plan to move from Brooklyn to North Carolina. The plan the parties discussed was that they would sell the house in Brooklyn, that the Father would set up his business in North Carolina and find a home for the family there, the Children would finish out the school year in New York, and the Father would come back for the Mother and Children in early July, when they would all move to North Carolina. The Father moved to North Carolina in or about November 13, 2010. The Mother visited the Father in North Carolina in November 2010, and then the Father came back to New York briefly in December 2010. After he returned to North Carolina, the parties spoke daily. The Father came back to New York briefly in January, February and April 2011.

From November 2010 to June 2011, the Mother and Children saw the Mother's parents almost every night.

The Father rented a three bedroom trailer in Jacksonville, North Carolina. He told the Mother that they would move there temporarily. In April 2011, he stopped providing financial support to the Mother, and began calling her and the Children less frequently. The Mother obtained some funds from her parents, and from her mother-in-law. On May 28, 2011, the Mother and Children moved back into her parents' home in Brooklyn because it was too hot in their home, since the Father had removed the air conditioners on his last visit. The Mother questioned the Father as to whether anything had changed, but he denied it. In late June 2011, they discussed a plan that he would come back in July, and that they would all drive to North Carolina together.

The Children spent Memorial Day weekend 2011 with their paternal grandmother. While they were there, she told the Mother that she wanted the Children to spend the last weekend in June with her. The Mother agreed, but said that the Children needed to return home on July 2 or 3, 2011, as the Mother wanted to take them to a 4th of July party at her brother's home in Long Island, and to a graduation party for Scott on July 9. The Father's mother agreed to this plan.

In or about February 28, 2011, the Father met Ms. Gallagher, who lives at 796 Washington Acres Road, Hampstead, North Carolina (the Gallagher Home). Soon after that, the Father and Ms. Gallagher started seeing each other regularly and talked on the phone often. She brought him to family gatherings with her, and by June 2011, considered him a role model for her son, Daniel, then approximately seven years old.[2] The Father often called his Children from the Gallagher Home. By June, the Father and Ms. Gallagher had agreed that he and the Children would move into the Gallagher Home. The drive from the Gallagher Home to New York City takes approximately 11 hours. On June 24, 2011, Ms. Gallagher, at the Father's request, bought airline tickets for the Father, his mother and the Children to fly from New

---

[2] Daniel was 10 at the time of trial. Ms. Gallagher testified that she was not married to Daniel's father, but he was a friend of hers, whom Daniel has met. Nevertheless, Daniel does not know that the man is his father. At trial, Ms. Gallagher testified that she had not decided what she will tell Daniel if he asks who his father is.

York to North Carolina on July 3, 2011, and for the Father to fly back to New York from North Carolina on July 8, 2011. In late June 2011, the Father drove from North Carolina to New York.

The Father did not tell the Mother about his relationship with Ms. Gallagher. Clearly, when he told the Mother in the spring of 2011 that they and the children would all drive to North Carolina together in mid-July 2011, he was deliberately misleading her. Similarly, when his mother told the Mother that she would return the Children on July 3, 2011, she was also lying to her.

The Father's mother picked the Children up from the Mother in late June 2011, having told the Mother that she would return them on July 3. The Father was at his mother's home when she arrived with the Children. Over the next few days, the Mother repeatedly called the Children, but could not reach them. Alarmed, she called the Father, who falsely told her that his mother had taken the Children camping. On Sunday, July 3, 2011, the Father's mother did not return the Children to their Mother. That day, without telling the Mother, the Father flew with the Children and his mother to North Carolina. Ms. Gallagher picked them up at the airport in North Carolina.

On July 7, 2011, the Mother went with her father to her mother-in-law's home to pick up the Children. When they arrived, she discovered that the Children and her mother-in-law were not there. She was very alarmed, because she did not know where the Children were. She called the police. A police officer arrived and called the Father. The officer told the Mother that the Father said that he was in North Carolina with the Children, and that he would bring them back the next day.[3] He did not do so.

On July 7, 2011, the Father went to a lawyer recommended by Ms. Gallagher.[4] On July 7, 2011, the Father and/or his mother made a complaint to the local Child Protective Services in North Carolina, and then to the New York Statewide Central Register of Child Abuse and Maltreatment (the NY Central Register), alleging that Gabrielle had been sexually molested by the Mother's father, Armand Elster.[5] At or about the same time, he also called the police in Wilmington, and the District Attorney in New York and made the same allegations.

By July 7, 2011, the Father and the Children had moved into the Gallagher Home.[6] Ms. Gallagher did not tell her son that the Father, Jacob and Gabrielle were moving into their home until after they had done so. She did not have any conversations with the Mother before the Father, Gabrielle and Jacob moved into her home.

Although the Father and Ms. Gallagher claim that he paid her rent of $300 per month for the months of July, August, September and October 2011, there is no documentary evidence that he did so. In any event, they acknowledge that he has not paid her any rent since then.

---

[3] The Father's claim that he moved to North Carolina alone because the Mother had simply decided not to move to North Carolina is totally incredible.

[4] The Father falsely stated in an affidavit in October 2011 that he had seen the Mother in New York on July 6, 2011.

[5] Although the Father testified that, on July 6, Gabrielle told his mother, and then him, that Mr. Elster had sexually molested her, I do not credit this testimony.

[6] The Father's claim that he intended that the Mother move into Ms. Gallagher's home in mid July 2011 is entirely incredible.

On or about July 7, 2011, ACS worker Mr. Davis, and two NYPD detectives interviewed Mr. Elster about the complaint that he had molested Gabrielle. He told them that he had not done it. As he testified at trial, he "would have cut off [his] hands first." When he went home, he cried from the shock of the accusation. Mr. Davis and the detectives also interviewed Mr. Elster's other granddaughters and his daughter-in-law. Mr. Davis told the Mother that the Children were in North Carolina.

On or about July 7, 2011, the Father commenced an action in Pender County, North Carolina, in the General Court of Justice, District Court Division, under File Number 11 CVD 0613, seeking custody of the Children (the NC Action), and asking that North Carolina assume emergency jurisdiction over custody of the Children.[7] He claimed that Gabrielle had disclosed to his mother on July 6, 2011 that she had been sexually abused by her maternal grandfather, Mr. Elster. He further claimed in that complaint that the Mother was "not a fit person to have custody of the minor Children."[8]

On July 8, 2011, before the Children woke up, the Father left the Gallagher Home and flew back to New York, using the ticket that Ms. Gallagher had purchased for him two weeks before at his request.[9] While he was in New York, the Children were at the Gallagher Home with Ms. Gallagher and the Father's mother. Ms. Gallagher said that they seemed "happy" while their Father was away. No one arranged for the Children to speak with their Mother while the Father was in New York.

While the Father was in New York, he spoke to a NYPD detective and Mr. Davis concerning his complaint that Gabrielle had been abused. While he was in New York, he discovered that his cell phone was not working. He called Ms. Gallagher who added him to her cell phone plan. He stayed in New York for about one week, and returned to North Carolina sometime before July 17, 2011.

On or about July 28, 2011, Crystal Larkin, a caseworker from the North Carolina Child Protective Services, interviewed Gabrielle at the Gallagher Home. Ms. Larkin then spoke to the Father. He told her that, soon after he had moved to North Carolina in October 2010, he had learned that the Mother was living with a man named Hector, and that, when he returned to New York to pick up the Children, he saw that her home was in a poor condition, and he decided to take both Children and leave.[10]

In July and August 2011, the Father told Ms. Gallagher that the Mother was a drug addict; that she used heroin; abused other drugs, including Xanax and valium; and was also unable to care for the Children properly because of her diabetic condition that would cause her frequently to go into a diabetic coma. He told her that, during the period he was in North Carolina and the Children were with their Mother in New York, he assured that they were safe by having her parents and 14 year old Scott monitor the Mother's condition.

---

[7] Although the Father testified to different dates when he and the children moved into the Gallagher Home, he swore in his court papers on July 7, 2011 that he resided in Pender County, where Ms. Gallagher lives, and that he had "previously" lived in Onslow County, where the trailer was located. Consequently, he is judicially estopped from denying that he lived in the Gallagher Home at least as of July 7, 2011.

[8] This renders totally incredible the Father's testimony that he still intended to return to New York the next day to pick up the Mother so that she could return to North Carolina and live with him and the children in the Gallagher Home.

[9] This renders incredible his testimony that Gabrielle disclosed two days before that she had been sexually molested by her grandfather. If Gabrielle had made such a disclosure, then it would have been extremely poor parenting indeed to leave her two days later in a strange home, with a woman she had met only a day or two before, while he flew to New York.

[10] There was no other mention of "Hector" during the trial.

During July and August 2011, the Children did not speak to their Mother.

In August 2011, the Father enrolled Gabrielle at South Topsail Elementary School, and Jacob in a nursery school, Gateway Academy (Gateway).

On August 22, 2011, both parties appeared in Family Court in Brooklyn on the Mother's application for a writ of habeas corpus. The Father came to New York without the Children, whom he left in North Carolina with Ms. Gallagher.

While the Father and Children were living in the Gallagher Home, he was working typically 40 hours per week, and sometimes more, when he worked from home at night on his computer. He bought food for the household, and bought items for his Children, including shoes, clothing, and school supplies. He also paid for day care for Jacob, after school activities for Gabrielle, health insurance, medical bills, dentist visits, and field trips. He took the Children to activities for which he paid, such as movies, roller skating, and bowling. Between July 2011 and March 2014, Ms. Gallagher loaned him at least $43,000, by means of giving him actual cash loans, making payments to third parties on his behalf, and permitting him to make purchases on her credit card.

In or about October 2011, the Mother used marijuana and then voluntarily went into a drug counselling program.

In October 2011, the Father first arranged for Gabrielle to see a therapist.

On October 11, 2011, the Father appeared in this court, and the court ordered that the Mother visit and have telephone calls with the Children. That was the first time when the Mother learned exactly where the Children were since the Father had taken them to North Carolina in July 2011. At the Father's request, Ms. Gallagher arranged the first phone call between the Children and their Mother, but she did not permit them to talk with Scott; in fact, she terminated the phone call when she heard one of the Children address Scott.

The Mother next saw the Children on both days of a weekend in late October 2011 at Power of Play, an indoor play area in Wilmington, North Carolina. Each visit lasted four hours, with a supervisor present for half of that time. Starting in late October 2011, the Mother and Children also had regular phone calls, five nights per week. However, there were occasions when the Father did not let the Children talk with their Mother. When he did let them speak to her, he did not give them any privacy during the telephone calls. He did not permit them to speak with Scott at all.

On or about December 5, 2011, the Father came to New York alone, leaving the Children in the care of Ms. Gallagher. On or about December 8, Ms. Gallagher took Gabrielle to the airport and Gabrielle flew alone to New York. On December 9, 2011, the Father appeared unannounced with Gabrielle at Safe Horizon's Brooklyn Child Advocacy Center,[11] where she was interviewed by a Forensic Clinical

---

[11] Mr. Davis testified at the earlier hearing before this court that, in New York City, child sexual abuse interviews customarily take place at the Child Advocacy Center, where a team of professionals from different agencies involved in the investigation of child sexual abuse reports, including social workers, child protective workers, police, and representatives of the District Attorney's Office, coordinate their efforts.

Specialist employed by Safe Horizon. The interview was observed by representatives of ACS and NYPD, and an Assistant District Attorney from the Crimes against Children Bureau of the Brooklyn District Attorney's office. These professionals all agreed that Gabrielle had been coached, and that her statements were not consistent or believable and were "imaginary." Accordingly, ACS determined that the complaint was unfounded. The Father never told Ms. Gallagher about this finding.

On December 6, 2011, this court issued the December Order, which found that this court has 'home state' jurisdiction to determine custody of the Children, pursuant to the Uniform Child Custody Jurisdiction Enforcement Act ("UCCJEA," codified as DRL Art. 5-A, §75 et seq., in New York, and as Gen. Stat. §50a-101 et seq. in North Carolina).[12]

While Gabrielle was in New York in December 2011, the Father did not arrange for her to see her Mother.

On December 23, 2011, this court directed the Father to return the Children to New York and to enroll them in a New York school for the spring semester. The Father did not do so.

The Father made many additional reports about the Mother's alleged treatment of the Children to, *inter alia*, ACS and the Suffolk County Department of Social Services. Each time he made a report, the Children were interviewed. All of his reports were determined to be unfounded.

While the Children were in North Carolina, Jacob attended Gateway, located in Wilmington, North Carolina, from August 2011 until April 2, 2013. Jacob was prepared for school and did well. The Father listed Ms. Gallagher as an emergency contact for Jacob, but not the Mother. Both the Father and Ms. Gallagher told the Director of Gateway, Ms. Horne, that they felt that the Children were not safe when they were with their Mother. Both the Father and Ms. Gallagher told Ms. Horne about some of the various orders in place regarding custody and access. Ms. Horne did not observe any unusual behavior by Jacob after his visits with his Mother.

On March 9, 2012, North Carolina District Court Judge Faison entered an order dismissing the NC Action, and finding that this court has custody jurisdiction under the UCCJEA. The Father filed a Notice of Appeal of the December Order, and obtained a stay of the December Order's directive that he return the Children to New York from North Carolina.

On March 22, 2012, in this court, the parties entered into a stipulation for the Mother to have three two-hour supervised visits with the Children in April. Pursuant to the stipulation, the Mother had visits with the Children in North Carolina on April 2, 3 and 4. Her visit on April 2 was the first time she had seen them since the visit in October 2011. On April 20, this court entered an order directing that the Mother have a seven hour visit with the Children before May 17, 2012. When the Mother went to pick up the Children, the Father would not permit her to see them until she came back with a sheriff. When the Mother called, the Father often would not permit her to speak with the Children. She did not have a visit in May 2012.

---

[12] Before issuing this decision, in accordance with the procedures required by the UCCJEA, the court conferred with Judge Faison, who was presiding over the NC Action.

Pursuant to an order of this court dated June 7, 2012, the Children were supposed to be with the Mother from June 11, 2012 through August 20, 2012. On June 11, the Father would not permit them to go. The Mother then obtained an order from the North Carolina court dated June 11, 2012 which directed that the Mother pick up the Children from the Father at 10:00 a.m. on June 12 and retain them in her care until August 20, 2012. When she returned for the Children with a sheriff, the Father permitted her to take them. That was the first time that Ms. Gallagher and the Mother met.

On August 10, 2012, the parties entered into the August Stipulation in this action, which was so-ordered by the court, and which: 1) set out a schedule for the Mother to have access with the Children including, *inter alia*, from Friday, February 8, 2013 to Monday, February 12, 2013 in North Carolina, and from Friday, March 22, 2013 to Monday, April 1, 2013 in New York; 2) provided that, for weekend visits, the Mother was to pick up the Children from, and return them to, their schools; 3) directed the Mother to take the Children to any scheduled team activities, performances or medical/dental appointments during her parenting time; and 4) directed her to give two weeks' notice to confirm the weekend visits.

The Father made several motions in the NC Action between May and September 2012, including a request that the North Carolina court modify the August Stipulation entered into by the parties in this court. All of the Father's requests in the NC Action, including for modification of the August Stipulation, were denied. The Mother had visits with the Children in North Carolina in September and October 2012. As a result of one of the Father's applications, in October, the North Carolina court scheduled a court appearance to take place in February 2013.

On or about August 29, 2012, the NY Central Register informed Mr. Elster that the complaint against him was unfounded. He received another letter that he was being investigated on or about April 9, 2013 and additional letters that the complaints against him were unfounded on or about May 16, 2013 and February 10, 2014.

In October 2012, a social worker from North Carolina went to the Gallagher Home and interviewed the Father, Ms. Gallagher and the Children.

On October 25, 2012, the Mother's then boyfriend, James Jones, was arrested for violence against the Mother, and she obtained an order of protection barring him from contact with her.

In November 2012, the Father again moved in the NC Action for a finding of civil contempt against the Mother for her alleged violation of an order previously issued in the NC Action on June 12, 2012. Proceedings in the NC Action resulted in an order dated November 13, 2012 awarding attorney's fees and sanctions to the Mother, stating that the Father's

> ...refusal to accept Judge Gesmer's decision not to relinquish jurisdiction to this Court is not well grounded in fact or warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.

The parties had agreed that the Children would go to New York to be with the Mother for the 2012 Thanksgiving vacation, but the Father told the Mother that he was not going to bring them to New York, and he in fact did not do so. He told Ms. Gallagher that he was "unable" to do so.

The Children spoke with their Mother on the telephone regularly during the period from November 2012 through March 2013.

By order dated December 14, 2012, the North Carolina Court recognized that New York had custody jurisdiction, directed both parties to comply with the August Stipulation, and specifically directed that the Mother was to have access with the Children from December 21, 2012 until January 1, 2013, and that she was also to have access on the dates in 2013 set forth in the August Stipulation. The order also required that the Mother ensure that the Children have no contact with James Jones. The Father was aware of this order, and the Children did visit with the Mother in New York from on or about December 19, 2012, when the Mother picked them up from school, until on or about January 1, 2013, when she returned them to the Gallagher Home. While the Children were at their Mother's home, Gabrielle told her Mother that she had lied about the allegations about Mr. Elster. At the end of the visit, Gabrielle did not want to leave her Mother.

In January 2013, Ms. Gallagher made a report to the Pender County Department of Social Services concerning the Children, and the Father filed a motion for contempt against the Mother in Pender County, North Carolina.

In or about January 2013, the Father received various documents from the North Carolina Child Protective Services Central Registry. On or about January 9, 2013, the Father received from the New York State Office of Children and Family Services a copy of information in the NY Central Register concerning the parties, including the results of an investigation of the parties and their Children, which stated that the case had been determined to be 'unfounded' and had been sealed.

In or about late January 2013, the Mother texted the Father to confirm that she would visit the Children in North Carolina from February 8 to 10, 2013, consistent with the August Stipulation. She received no response.

On February 4, 2013, all criminal charges against Mr. Jones were dropped. At or about the same time, the North Carolina court entered a judgment of divorce between the Mother and Father.

For the February 2013 visit, the Mother drove to North Carolina with her father, and was met there by Mr. Jones. On Friday, February 8, the Mother went by herself to Gabrielle's school, Top Sail Elementary, to pick her up. She spoke to the principal of the school, Ms. Romeo-Lehrer, and was advised that Gabrielle was not in school. She then drove to Jacob's school, Gateway. She spoke to the director of the school, Danielle, who asked her if Jacob was okay. Danielle then went into the school, and came back out, and told the Mother that she had received a telephone call from the Father saying that Jacob was already with the Mother for the weekend. The Mother then called the Pender County Sheriff's Department (PCSD), told them what had occurred, and asked that an officer go to the Father's house. The PCSD called back to say that neither the Father nor the Children were there, and the only person at home said that Jacob and Gabrielle were with the Father at his work place. The PCSD told the Mother to contact the Wilmington Police Department (WPD), since the Father's workplace is within its jurisdiction.

The Mother then called the WPD, who sent an officer to the Father's workplace and reported that the Father and Children had just left. The Mother then called back the PCSD, who said that they would

check the Father's home in a few hours, and would call her back. The PCSD later called back, and said that they could not send anyone until 9:00 p.m. that evening, so the Mother asked them not to go, since she did not want to upset the Children at bedtime.

The PCSD checked the Father's home Saturday morning, Saturday afternoon and Sunday morning. Each time, no one was at home. The Mother was not able to communicate with the Children at all while she was in North Carolina, and also received no communications from the Father. She left North Carolina on Sunday, February 10, 2013, without having seen or spoken to the Children.

The court in the NC Action issued an order dated February 22, 2013 in which it found that the Father had filed "motions which are cumulative and repetitive, and are in disregard of previous directives and orders of this Court." Based on this finding, the North Carolina Court imposed a "gatekeeping order," which requires that the Father not file any other motion in that Court unless he first presents an attorney verification stating why it is appropriate for him to file it. The North Carolina court also vacated the portion of its December 18, 2012 order which required the Mother not to have the Children around Mr. Jones.

The Father intentionally prevented the Mother from seeing the Children in February 2013, and knowingly violated the orders of this court and the North Carolina court in doing so. He felt that he was justified in doing so because she had traveled to North Carolina with her father, and because she was joined in North Carolina by Mr. Jones, both of whom the Father does not approve.

On February 28, 2013, the Appellate Division for the First Department affirmed the December Order, finding that this court had jurisdiction to determine the custody of Gabrielle and Jacob pursuant to the UCCJEA, and the stay of the December Order was lifted.

On March 11, 2013, this court held a telephone conference call with the Father and counsel for the Mother and counsel for the Children, in which the court again directed that the Mother's visit with the Children in North Carolina would begin on March 22, 2013, consistent with the August Stipulation. On the same day as the telephone conference, the court issued a written order incorporating the oral directives made during the conference call (the March Order), which specifically stated that it is:

ORDERED that the Father shall take no steps to interfere with the Mother's parenting time with Gabrielle and Jacob, which is scheduled to commence on March 22, 2013 at or about 2:00 PM at the close of school; and it is further

ORDERED that the Father shall not keep the [C]hildren out of school on that day; and it is further

ORDERED that the Father shall not remove the [C]hildren from school on that day; and it is further

ORDERED that the Father shall not be at the school any time after drop-off on the morning of March 22, 2013; and it is further

ORDERED that the Father shall promptly notify the Mother of any change in the school dismissal time on March 22, 2013; and it is further

ORDERED that any notice of the Mother's intent to pick the [C]hildren up for that visit that may be required by the so-ordered stipulation of August 10, 2012, shall be deemed given by virtue of the discussion of the visit during the March 11, 2013 conference call....

The March Order was served on the Father by email and by regular mail the same day.

On March 21, 2013, the Mother sought and obtained in the NC Action an order directing local law enforcement assistance to assist her in connection with her scheduled visitation. That order directed the Father to comply with the March Order, and directed the PCSD, or any other North Carolina law enforcement agency with jurisdiction to act, to assist the Mother in obtaining physical custody of the Children for her scheduled visits under the March Order. On or about March 21, 2013, the Father decided that he would not comply with the March Order.

At 2:00 p.m. on Friday, March 22, 2013, the Mother went to Gabrielle's school, accompanied by an officer from the PCSD. Ms. Romeo-Lehrer told her that Gabrielle had not been in school for two days. The Mother then went to the Father's home, where she observed that there were no cars in the driveway. There was no reply to her knock.

The Mother then went with Corporal Frank from the WPD to Jacob's school, Gateway. They were told that Jacob had not been in school for two days. They then went to the Father's business address, but the Father was not there.

On Saturday morning, March 23, 2013, Deputy Clinerd from the PCSD went to the Father's home, but there was no one there. The Mother then advised her North Carolina attorney that she was going to return to New York because she could not afford to spend any more time in North Carolina. Despite receiving an email from the Mother's attorney directing him to produce the Children, the Father still did not communicate or produce the Children. He intentionally kept the Children out of school in order to prevent them from seeing their Mother.

The Father intentionally prevented the Mother from seeing the Children in March 2013, acknowledged to the court that he did so, and knowingly violated the orders of this court and the North Carolina court in doing so.[13] Ms. Gallagher was aware of this and thought it was appropriate. The Father felt that he was justified in violating the order because the Mother was in North Carolina with her father and Mr. Jones; because he believed that she had violated the August Stipulation on an earlier visit by not taking the Children to Hebrew school; and because he believed that the documents he had obtained showed that she had been "indicated" for child abuse or neglect.

---

[13] The court takes judicial notice of its decision and order on motion sequence 10 dated August 12, 2013, which found the Father to be in civil contempt of the August Stipulation and the March Order, and imposed a fine in the amount of the Mother's expenses incurred traveling to North Carolina in February and March 2013.

The Father repeatedly prevented the Children from speaking with the Mother, despite the existence of three court orders directing that phone contact occur. He also prevented them from speaking with their half-brother, Scott.

On March 29, 2013, the Mother submitted an Order to Show Cause (Motion Sequence 10) seeking to hold the Father in contempt for his willful violations of the August Stipulation and the March Order, and requesting an ex parte order of access. The court signed the Order to Show Cause, scheduled a return date of April 5, 2013, and (1) ordered that the Mother have interim custody of the Children, pending a full hearing; (2) directed her to pick up the Children from their schools on Tuesday, April 2, 2013; (3) directed the Mother to advise the local police of this order, and to seek their assistance; and (4) ordered that the Father not interfere with the Mother's pick up of the Children on April 2, that he not keep the Children home from school, and that he not interfere in any way with the Children's departure with their Mother, on his own or with the assistance of third parties (the March 29 Order).

On April 2, 2013, the Mother, accompanied by a sheriff, picked up Gabrielle from her school and then Jacob from his school at about 12:30 p.m., and provided both schools with copies of the March 29 Order. Ms. Horne asked the sheriff if the Father knew that Jacob was being picked up, and the sheriff told her it was not necessary. Nonetheless, Ms. Horne instructed the assistant director of Gateway to call the Father to tell him that the Mother was picking up Jacob. Jacob told Ms. Horne that the Father had told him not to go with the Mother. When Jacob saw his Mother, he ran to her and got in her car.

When the Father received the call from Gateway, he and Ms. Gallagher drove to Gateway, arriving a few minutes after the Mother had left with both Children. The Father and Ms. Gallagher, with Ms. Gallagher driving, drove onto the interstate, and began to follow the Mother, who had the Children in her car. At one point, Ms. Gallagher drove immediately in front of the Mother's car, and slammed on the brakes, putting them all in great danger. She then continued to pursue the Mother's car on the highway for some distance, and repeatedly tried to cut them off, thereby further endangering them. The Father and Ms. Gallagher continued to follow the Mother as she exited I-40 at Market Street (also known as Route 17), and followed her for a few miles down Market Street. At that point, one of them flagged down a police officer. After they each spoke to an officer, one of the officers directed the Mother to go back onto the highway. The Mother and Children then drove back to New York, without further incident.

**Since April 2, 2013**

On April 18, 2013, this court issued a temporary order of protection directing the Father to stay away from the Children, except for supervised visitation. On July 18, 2013, after a two-day hearing, this court issued the one-year final Order of Protection in favor of the Mother and the Children and against the Father, through July 17, 2014, finding that the actions of the Father on the highway in North Carolina constituted disorderly conduct, stalking in the second, third and fourth degree, harassment in the second degree, menacing in the first, second and third degree and reckless endangerment. However, the Order of Protection permitted the Father to have supervised visits with the Children for up to six hours per week.

Upon a finding that forensic social work services were necessary, and that the parties could not afford to pay for them, this court issued orders dated April 22, 2013 and June 14, 2013 appointing Comprehensive Family Services (CFS) to supervise the Father's visits and telephone calls with the Children. By order dated May 13, 2014, this court denied the Father's motion sequence 20, which sought

to extend payment of CFS's fees by New York County, pursuant to Article 18B, Section 722-c of the County Law,[14] but encouraged him "to make arrangements with CFS, or any other visitation supervision agency on which the parties and the attorney for the children may agree, for supervised visits at his own expense."

After the Children's return to New York in April 2013, they lived with their Mother and Scott in Mr. Elster's home in Brooklyn. The Mother enrolled them in school. Mr. Elster has been involved in their care, buying toys and clothes for them, and driving them to places they needed to go.[15] The Mother has taken them to the pediatrician, the cardiologist, the ophthalmologist, the gastroenterologist and a dermatologist. There has not been a single incident where the Mother has passed out because of her diabetes; in fact, there has not been such an incident since November 2010. In April 2013, the Mother was hospitalized because of her diabetes, and she arranged for her sister-in-law, Erika Elster, to care for the Children. She has made arrangements for friends or family members to care for the Children in the event of another incident.

Since April 2013, the Father has worked much longer hours, including evenings, most Saturdays and many Sundays.

Since April 2, 2013, the Mother and Father have not communicated directly at all.

Following the Children's return to New York in April 2013, the Father made repeated reports of alleged abuse and/or neglect of the Children by the Mother and her father, none of which resulted in a finding of abuse or neglect. In April 2013, the Father went to New York for approximately three weeks. During that time, he attended an appearance before this court, and met with various agencies, including the offices of the District Attorneys in at least two counties, in order to request that they press charges against Mr. Elster for allegedly abusing Gabrielle. On one of these occasions, Ms. Gallagher went with the Father to the Kings County District Attorney's office. At least three subsequent reports with the same allegations were made. On or about April 9, 2013, the Father made a report to the hotline at the NY Central Register, alleging that the Children had been left with Mr. Elster, whom Mr. Gottlieb alleged was a "sex offender" and had sexually abused Gabriele. ACS conducted a complete investigation. They interviewed the Children at school because the Mother would not allow ACS personnel in her home. ACS found that the allegations were unfounded. ACS did not place any limitations on the Children spending time with Mr. Elster. Another report was made on or about April 19, 2013, which was closed because there was already an investigation occurring. At least two subsequent reports were made, neither of which resulted in a finding of abuse or neglect against the Mother or Mr. Elster. The Children were interviewed in connection with each report. In or about September 2013 and again in November 2013 and in early 2014 there were additional ACS investigations of the Mother which were again determined to be unfounded.

The Father has also made repeated anxious and unfounded inquiries about the Children's health, both to this court and to the Children.

---

[14] As discussed in the May 13, 2014 order, that statute does not permit payment by the County of fees for services that are not forensic in nature. Since this trial had commenced, CFS's supervision of visitation no longer had a forensic component.

[15] He described that the Children write letters to their deceased grandmother, and he takes them with him to the cemetery when he goes to visit her grave.

The Father had a supervised visit with the Children on April 27, 2013. Although he claimed to the CFS visitation supervisor that the Children were dirty, it was the supervisor's observation that the Children were neat and clean. The supervisor, Ms. Thomsen, also observed that, when she met with the Children the day before, they were afraid of their Father, and were specifically afraid that he would take them back to North Carolina.

The Father next saw the Children in May or June 2013 at the office of CFS. He again claimed the children were dirty, which was again not supported by the CFS report.

Ms. Gallagher still has at her home some of Jacob's personal items, including his bed, clothes, video games, toys, and his "DS" video game. Although Jacob has specifically requested his video game, his Father has not given it to him, because it was a present from Ms. Gallagher, and she will not agree to Jacob having it in New York. She also has at her home Gabrielle's bed, clothes, shoes, toys, bikes and her "DS" video game. Gabrielle's video game is still in North Carolina as well, because Ms. Gallagher will not consent to Gabrielle having it in New York. Ms. Gallagher gave Gabrielle's winter coat to her sister's foster child.

In October 2013, Mrs. Elster became ill and died soon after.

### Dr. Cohen's Findings

On October 1, 2013, Dr. Cohen issued his forensic report (the Report). Before doing so, he interviewed each of the parties individually, met with each of the Children individually, conducted joint interviews of the Children with each of their parents, and met with the parties jointly. Dr. Cohen also conducted and reviewed substantial collateral data and spoke with a number of collateral interviewees, including Jacob's preschool teacher and Gabrielle's guidance counselor.

Dr. Cohen found that the Mother had sufficient intelligence to adequately parent both Children. He concluded that she had developed a relationship with both Children in which there is a clear connection, bond and emotional attachment, and that she had essentially been the primary caretaker for these Children in the years prior to their move to North Carolina. On the negative side, he noted that the Children had heard negative comments regarding their Father while in the Mother's care, and they witnessed violence between the Mother and her former boyfriend, James Jones. Dr. Cohen also noted that there were limited periods where the Mother could not care for the Children due to her diabetes. However, he noted that her prescribed medications had no negative effect on her parenting ability. Dr. Cohen could not conclude whether or not the Mother had used illegal substances to an extent that affected her ability to care for the Children.

Dr. Cohen found that the Father believes he is prescribed Adderall for muscle fatigue; however Dr. Pepper, the Father's doctor, said it was prescribed for Attention Deficit Disorder.

The fact that the Father moved his Children from New York to North Carolina and moved the Children in with his girlfriend made Dr. Cohen question his parenting skills. Dr. Cohen found that, during the car chase that occurred in April 2013, the Father exhibited poor parental judgment, which negatively impacted the Children. If the Father blocked contact between the Mother and the Children from the time the Children moved to North Carolina until October 2011, which this court finds he did, Dr. Cohen

further opined that would constitute poor parenting ability. Gabriele told Dr. Cohen that her Father told her that her Mother had died in a car accident. Dr. Cohen believes that, if he did so, it would be extremely poor judgment as a parent.

Dr. Cohen concluded that the Father's multiple reports to ACS that Gabrielle was sexually abused by Mr. Elster, all of which were found not to be indicated, suggested that he may suffer from a fixed delusion. If so, and if this condition continues, Dr. Cohen found that it would result in interference in the relationship between Gabriele and her Mother, and ultimately result in a rupture of that relationship. For Gabriele, this could result in an increased likelihood of depression, problems with her own children later in life, and a likelihood of difficulty in her adult relationships. In Dr. Cohen's professional opinion, if the Father continued to make child protective agency reports, and no abuse has occurred, this would reflect negatively on the Father's parenting abilities due to the impact it would have on Gabriele. This would also be distressing to Jacob. Dr. Cohen recommended that the Father consider a period of psychotherapy.

Dr. Cohen found that if the connection between the Children and Scott Elster were severed, it would have a negative impact on the Children.

Dr. Cohen found that the parties would not be able to work cooperatively regarding their Children and that they would not be able to make decisions jointly for the Children.

Dr. Cohen's professional opinion is that losing contact with either parent is a loss to the Children. He found that supervised visitation is better than not having contact at all.

Dr. Cohen concluded that it would be a "tremendous upheaval" for the Children to move at this point.

### The Parties' Actions Since the Issuance of Dr. Cohen's Report

The Father has not entered counseling, psychotherapy or any kind of psychological treatment. As of the time of trial, he continued to believe that Gabrielle was molested by her grandfather, that Mr. Davis perjured himself and was paid off to do so, that Armand Elster paid someone off so that he would not be found to have molested Gabrielle, and that the Children are in danger in the Mother's care.

The Father had supervised telephone calls with the Children several days per week from April through December 2013. After his supervised visit with the Children on June 25, 2013, the Father had supervised visits with the Children on one occasion in each of September, October 2013 and December 2013. He then stopped speaking to them on the telephone. He next saw the Children for a supervised visit in February 2014. After this, he then did not speak to them until June 2014, and did not see them until July 2014. He did not see them in August 2014. The Father had a supervised visit on or about September 6, 2014. The Father scheduled a visit for October 15, 2014, which had to be cancelled because it was a trial date. The Father cancelled a visit scheduled for November 18, 2014. The Father had a supervised visit on December 2, 2014. The Father cancelled visits scheduled for December 17, 2014, January 21 and 31, 2015. Since July 2014, he has called the Children rarely, which he claims is in part because of the cost of the supervision. The Father also blamed CFS and the Children's attorney for his failure to see the Children.

The Father's mother has not seen or spoken to the Children since April 2013.

Since the Children have been in New York, the Father has had access to their medical providers, and has received all information concerning any medical treatment rendered to the Children. The Mother has provided him with HIPAA releases for all of the Children's medical providers.

### The Parties' Proposals

The Mother proposes that she have sole legal and physical custody; that the Father have weekly supervised access with the Children in New York (or two weekend days on alternate weekends), and daily supervised telephone calls with them.

The Children's attorney proposes that the Children remain in the primary care and custody of their Mother. The Children's attorney reports that her clients asked that they be able to speak with their Father on the phone four evenings per week, as long as he did not ask them for information about their Mother's household or other inappropriate information. The Children's attorney asks that they continue their current access schedule with the Father of one supervised visit per month. She would not object to an increased frequency of supervised visits, provided that the Father would have to confirm each visit two weeks in advance; and that his visitation schedule would be diminished if he cancelled confirmed visits.

The Father proposes that he have sole legal and primary physical custody of the Children in North Carolina, where they would reside in the Gallagher Home, and that the Mother be permitted visitation, provided that she comes alone.

### Order of Protection

The Mother also asked that the court enter a new order of protection, claiming that the evidence showed that the Father had committed acts constituting disorderly conduct, stalking in the fourth degree, aggravated harassment in the second degree, menacing in the second degree, and attempted assault.

### ANALYSIS

Custody

A determination of child custody must serve the best interest of the child and must promote the child's welfare, based on the totality of the circumstances (*Eschbach v Eschbach*, 56 NY2d 167 [1982]; *Friederwitzer v Friederwitzer*, 55 NY2d 89 [1982]). As the Court of Appeals wrote in *Friederwitzer*, neither parent has a superior right to custody of a child:

> The only absolute in the law governing custody of children is that there are no absolutes. The Legislature has so declared in directing that custody be determined by the circumstances of the case and of the parties and the best interest of the child but then adding 'In all cases there shall be no prima facie right to the custody of the child in either parent.'

(*Id.* at 93-94, citing DRL §§240 and 70). Among the factors that courts should consider in determining the child's best interests in a custody dispute are the arrangement that is likely to provide the most stability

for the child, the fitness of the respective parents (*Id.* at 94), the quality of the environment in each parent's home, the quality of parental guidance each parent is capable of providing, each parent's ability to meet the child's emotional and intellectual needs (*Eschbach,supra,* at 172), and the ability of each parent to foster the child's relationship with the other parent (*Bliss v Ach*, 56 NY2d 995 [1982]; *Lubit v Lubit*, 65 AD3d 954 [1st Dept 2009]).

One of the primary responsibilities of a custodial parent, and a factor to be considered by the court, is a parent's willingness to ensure meaningful contact between a child and the other parent (*Tori v Tori*, 67 AD3d 1021 [2d Dept 2009]). This is a particular example of a parent's ability to put the child's needs above their own, since a parent who is inhibiting the child's relationship with the other parent is generally acting out of his or her own anger rather than out of an evaluation of the child's needs.

Joint custody is not appropriate where the parties' relationship is characterized by acrimony and mistrust (*Lubit v Lubit*, 65 AD3d 954 [1st Dept 2009]; *Trapp v Trapp*, 136 AD2d 178 [1st Dept 1988]).

The critical facts in this case include the following:

1.     Although the Father claimed that the Mother was unfit for a variety of reasons, he nonetheless left them alone with her from about October 2010 to July 2011;

2.     The Father kidnapped the Children from their Mother, and arranged for them to move into the home of his girlfriend, who encouraged and supported the Father's violation of court orders;

3.     The Father repeated a story that Gabrielle had been sexually molested by her maternal grandfather, and continues to believe it, even though ACS has investigated, and repeatedly found his claims to be unfounded;

4.     The Father repeatedly violated court orders (*In re Dara B. v Jonathan B.*, 127 AD3d 518 [1st Dept 2015][significant weight should be given to parent's failure to comply with court orders to return the child]);

5.     The Father took repeated steps to separate and alienate the Children from their Mother, including by preventing her from having court-ordered visits in May 2012, Thanksgiving 2012, February 2013, and March 2013, and by attempting to prevent her from doing so in summer 2012 and April 2013, on both of which occasions the Mother was able to effectuate the visits with the assistance of the North Carolina court and/or local law enforcement;

6.     The Father repeatedly made baseless complaints to various agencies concerning the Children's well-being;

7.     The Father voluntarily did not see the Children for most of the last year (*Matter of Connolly v Walsh*, 126 AD 3d 691[2d Dept 2015][Trial court erred in not giving sufficient weight to father's voluntary two year absence from the child's life and his rejection of repeated offers to engage in therapeutic visitation]); and

8.     The Father put the Children in physical danger by engaging in a car chase with them in April 2013, after having unsuccessfully attempted to prevent the Mother from having contact with them.

Having considered the applicable legal principles, as applied to the facts set forth above, the court directs that the Mother shall have sole legal and physical custody of the Children.

In view of the history of this matter, and the likelihood that the Father may try to kidnap the Children again and/or say damaging and inappropriate things to them about the Mother and/or have them

further interviewed about unsubstantiated abuse allegations, the court finds that it is in the Children's best interest for their contact with the Father to continue to be supervised. Accordingly, the Father may have up to one supervised four-hour visit with the Children each week, or supervised visits on Saturday and Sunday of every other weekend for up to four hours each day, provided he confirms such visits at least 14 days in advance, and provided that he arranges for a supervisor to be present during the visits. In addition, the Father may have supervised telephone contact with the Children up to four days each week at reasonable times and for reasonable periods of time. All visitation and telephone access supervision shall be conducted by CFS, unless the parties agree in writing (email shall suffice) to another supervisor. In-person visits shall take place on the premises of the visitation supervision agency. The Father shall continue to be permitted to obtain the Children's school and medical records not otherwise privileged by law. The Mother shall be permitted to take up to two weeks of vacation with the Children during their summer school break each year, which vacation period shall supersede the Father's regular access schedule. The Father may seek to modify his access upon a showing that he has attended psychotherapy with a licensed therapist at least once each week for six months, and after he has had at least 12 in-person visits with the Children in a 12 month period.

The Mother's request for an order of protection is denied, for several reasons. First, she did not make a formal application for this relief at the beginning of the trial,[16] and consequently, it would be a denial of due process to impose it when the Father was not given appropriate notice. Second, such an application is barred by *res judicata*, in light of my decision dated July 17, 2014, in which I denied the application by the Children's attorney for extension of the Order of Protection issued in July 2013, and found that "[t]he forensic evaluator's testimony does not show that the Father has committed any Family Offense since April 2013." This denial is without prejudice to a future application if events subsequent to the trial warrant it.

The parties and counsel are reminded of the status conference regarding the remaining financial issues, scheduled to take place on June 18, 2015 at 2:15 p.m.

A separate custody order in accordance with this decision has been issued simultaneously herewith.

Dated: June 16, 2015

Hon. Ellen Gesmer, JSC

---

[16] The Mother's pre-trial proposed custody plan proposes issuance of an order of protection until the Children turn 18.